IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SPEPHARM AG,

        Plaintiff,

v.

EISAI INC.,

        Defendant.

Civil Action No. 1:19-cv-00965-RGA

## MEMORANDUM OPINION

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, DE; Martin J. Black (argued), Joseph J. Gribbin, and Luke M. Reilly, DECHERT LLP, Philadelphia, PA; Katherine A. Helm, DECHERT LLP, New York, NY.

        Attorneys for Plaintiff.

Joel Friedlander, Christopher M. Foulds, and Christopher P. Quinn, FRIEDLANDER & GORRIS, P.A., Wilmington, DE; Benjamin J. Razi (argued), Dennis B. Auerbach, and Jon-Michael Dougherty, COVINGTON & BURLING LLP, Washington, DC.

        Attorneys for Defendant.

September 4, 2019

*[Signature: Richard G. Andrews]*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before me are Plaintiff's Motion for Judgment on the Pleadings (D.I. 40), Defendant's Cross-Motion for Judgment on the Pleadings (D.I. 45), and Plaintiff's Motion to Strike Portions of Eisai's Reply Brief (D.I. 53). The Parties have fully briefed the issues. (D.I. 41, 46, 47, 49, 51, 56, 57). I heard oral argument on August 9, 2019. For the reasons set out more fully below, I will grant Plaintiff's Motion for Judgment on the Pleadings. Accordingly, I will deny Defendant's motion and dismiss Plaintiff's Motion to Strike as moot.

## I. BACKGROUND

Salagen is a drug used to treat dry mouth caused by radiation therapy for head and neck cancer and to treat dry mouth and dry eyes in individuals with Sjögren's syndrome. (D.I. 3, Compl. at ¶ 7). This case is about Plaintiff's license to distribute Salagen in certain European and Commonwealth of Independent States countries.[1] (*Id.*).

SpePharm and Eisai are the current[2] parties to three contracts that cover the distribution of Salagen: an April 11, 2000 license agreement ("License Agreement"), an April 11, 2000 supply agreement, and a July 29, 2009 pharmacovigilance agreement ("Pharmacovigilance Agreement").[3] (*Id.* at ¶ 6). Per these agreements, Plaintiff is the exclusive licensee of Salagen

---

[1] Plaintiff's distribution territory consists of:
    Albania, Armenia, Austria, Azerbaijan, Belgium, Belarus, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, The Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Greece, Hungary, Iceland, Ireland, Italy, Kazakhstan, Kyrgyzstan, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Moldova, the Netherlands, Norway, Poland, Portugal, Romania, The Russian Federation, Slovakia, Slovenia, Spain, Sweden, Switzerland, Tajikistan. Turkey, Turkmenistan, Ukraine, the United Kingdom, Uzbekistan and Yugoslavia.
(D.I. 3, Compl. Exh. A at § 1.1(x)).

[2] The original contract was between licensor MGI Pharma, Inc. and licensee CIBA Vision AG. (D.I. 3, Compl. at ¶ 8). The License Agreement has changed hands several times.

[3] The Parties do not dispute that each agreement is governed by Minnesota law. (D.I. 3, Compl. Exh. A at § 16.5; *Id.*, Compl. Exh. B at § 13.5; *see id.*, Compl. Exh. C, July 29, 2009

in its territory. (*Id.* at ¶ 7). Defendant is required to supply Salagen, and other services, to Plaintiff during the term of the License Agreement. (*Id.*).

The original term of the License Agreement, found in Section 11.1, provided for a minimum 12-year contract duration with rolling automatic continuations, assuming neither party sent notice of termination, into perpetuity:

> The term of this Agreement shall commence on the Effective Date and unless earlier terminated in accordance with the provisions of Article 11, shall continue in full force and effect until the twelfth (12th) anniversary of the Effective Date. Thereafter the term of this Agreement shall automatically be extended for additional two (2) year terms, unless written notice of termination is given by one party. Notice of intent to terminate on the anniversary of the original term or any subsequent extension shall be provided no later than 180 days prior to such anniversary date.

(D.I. 3, Compl. Exh. A at § 11.1). The original term of the License Agreement, therefore, extended until April 11, 2012.

In May 2015, Novartis Pharma AG ("Novartis"), the licensee at that time, and Eisai, at that point the licensor, negotiated an amendment to the License Agreement. (D.I. 3, Compl. at ¶ 17-19). Amendment 2 to the License Agreement provided the licensee with an option:

> As of the date of this Amendment, a permitted third-party transferee under Section 16.3 shall have the option, exercisable in its sole discretion upon written notice to Eisai, to amend the term contained in Section 11.1 such that the Agreement will expire on April 11, 2026. In the event such permitted third-party transferee exercises such option, following April 11, 2026 (i) the term will automatically be extended for additional two (2) year terms unless written notice of termination is given by a Party and (ii) notice of intent to terminate on the anniversary of the term or any subsequent extension shall be provided no later than 180 days prior to such anniversaly date. In the event such permitted third-party transferee does not exercise such option, the term contained in Section 11.1 will remain as is.

(D.I. 3, Compl. Exh. A at Amend. 2, ¶ 2). As consideration for this option, Novartis paid Eisai $500,000. (*Id.* at ¶ 1). Novartis also agreed to an augmented minimum royalty scheme. (*Id.*).

---

Pharmacovigilance Agreement at § 1 ("This Pharmacovigilance Agreement is to be construed in the context of the Master Agreement.")).

On May 20, 2015, Eisai consented to Novartis's request to assign the License Agreement to Merus. (D.I. 3, Compl. at ¶ 20). In 2018, Eisai allowed Merus to assign the License Agreement to SpePharm. (*Id.* at ¶ 22).

On March 28, 2019, Eisai sent a notice of its intent to terminate the License Agreement at the close of the current two-year period, which was set to end on April 10, 2020. (*Id.* at ¶ 38). That notice was sent to Norgine, not Spepharm, at an address other than the one described in the License Agreement. (*Id.* at ¶ 39). On April 1, 2019, SpePharm sent a letter to Eisai stating that it was exercising its Amendment 2 option to amend the term of the License Agreement to expire on April 11, 2026. (*Id.* at ¶ 41).

On April 1, 2019, Advanz Pharma Corp. announced that it had acquired the "global rights" to Salagen. (*Id.* at ¶ 43). On April 3, 2019, SpePharm reached out to Eisai for confirmation that Eisai intended to honor the License Agreement and continue supplying product through April 11, 2026. (*Id.* at ¶ 46). The next day, Eisai responded by asserting that SpePharm's exercise of its Amendment 2 option was ineffective. (*Id.* at ¶ 47). This litigation followed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) governs motions for judgment on the pleadings. Fed. R. Civ. P. 12(c). "Judgment [on the pleadings] will only be granted where the moving party clearly establishes there are no material issues of fact, and that he or she is entitled to judgment as a matter of law." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008). A court may rely exclusively "on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008). In considering the record, the court must "view the facts presented . . . and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Rosenau v. Unifund*

*Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)).

Contract interpretation is a question of law. *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004). "The primary goal of contract interpretation is to ascertain and enforce the intent of the parties." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn. 2009). "A contract is ambiguous if its language is reasonably susceptible of more than one interpretation." *Current Tech. Concepts, Inc. v. Irie Enterprises, Inc.*, 530 N.W.2d 539, 543 (Minn. 1995). The mere fact that parties proposed different interpretations of a contract does not, however, mean that it is ambiguous. *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). The determination of whether a contract is ambiguous is a question of law for the court. *Id.* In the event that a contract is ambiguous, parol evidence is admissible to interpret the agreement. *Id.*

### III. ANALYSIS

Defendant argues that Plaintiff's written notice to Eisai that it was electing to exercise its Amendment 2 option to extend the term of the contract was ineffective. (D.I. 46 at 8-17). Its primary contention is that its earlier notice of intent to terminate immediately terminated Plaintiff's Amendment 2 option. As I explain in detail below, I do not find Defendant's understanding of the contract is consistent with the plain and ordinary meaning of the License Agreement's provisions. Specifically, I find that (1) the plain language of the License Agreement supports SpePharm's position, (2) there is no express or implied expiration date in the Amendment 2 option, (3) Defendant's proposed "race to notice" understanding of the License Agreement is unreasonable, and (4) understanding Amendment 2 as surviving an earlier notice of intent to terminate does not render Section 11.1 meaningless. Thus, I find that SpePharm's written notice was effective to extend the contract to April 11, 2026.

First, the plain language of Amendment 2 unambiguously gives SpePharm the unilateral right to extend the contract term to April 11, 2026. "[A] court must give the contract language its plain and ordinary meaning." *Current Tech. Concepts, Inc.*, 530 N.W.2d at 543. Paragraph 2 of Amendment 2 provides that, as of the date of the Amendment, "a permitted third-party transferee under Section 16.3 shall have the option, exercisable in its sole discretion upon written notice to Eisai, to amend the term contained in Section 11.1 such that the License Agreement will expire on April 11, 2026." (D.I. 3, Compl. Exh. A at Amend. 2, ¶ 2). It is undisputed that SpePharm is a "third-party transferee" under Section 16.3. (*Id.*, Compl. at ¶ 23; D.I. 33 at ¶ 23). Thus, by its plain language, the Amendment 2 option was SpePharm's to take. In order to succeed, therefore, Eisai must establish that the Amendment 2 option was either canceled or caused to expire by the delivery of Eisai's notice of intent to terminate.

Second, reading an expiration date in to the Amendment 2 option is not reasonable. In option contracts, the expiration date is typically considered a material term. *See, e.g.*, *Ackley v. Honeywell Int'l Inc.*, 2019 WL 1496036, at *1 (W.D. La. Apr. 3, 2019) (noting that expiration date is a material term in stock option contract); *Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 325 (S.D.N.Y. 2001) (expiration date material in stock option contract); *Williams v. Employers Ins. Co. of Nevada*, , 2013 WL 1149553, at *5 (Tex. App. Mar. 15, 2013) (expiration date material term in option contract); *Best v. Edwards*, 217 Ariz. 497, 502, 176 P.3d 695, 700 (Ct. App. 2008) (expiration date material term in real estate option contract). Thus, expiration dates are the type of term I would expect to be set out expressly in an option contract.

The express language of Paragraph 2 does not contain an expiration date for the option, nor does the remainder of Amendment 2.[4] (*See* D.I. 3, Compl. Exh. A at Amend. 2, ¶ 2). Defendant argues that the option expired, by the implicit terms of the License Agreement, upon Eisai serving notice of its intent to terminate. There is no language, however, indicating that actions taken, or notices given, by the licensor impact the availability of the option to a third-party transferee. Defendant's understanding of the agreement would mean that Eisai had an implied power to void the option at any time. I do not find that it is reasonable, based on the plain language of the agreement, to understand the Amendment 2 option as Eisai suggests. It is much more reasonable to conclude that, if the contracting parties intended such a term, they would have stated it expressly rather than implying it.

Third, Defendant's understanding of the interaction between Amendment 2 and Section 11.1 as a race[5] is not reasonable. Defendant cites *Restaura, Inc. v. St. Louis Concessions, Inc.*, 52 F.3d 189 (8th Cir. 1995), as its primary support for the propriety of a "race to notice" interpretation of the License Agreement. (D.I. 46 at 9). In *Restaura*, the Eighth Circuit, applying Missouri law, held that Restaura's notice of a contractually permitted five-year extension, effective immediately, trumped St. Louis Concession's later notice of immediate termination. *Restaura, Inc.*, 52 F.3d at 191-92. Notice of immediate termination was allowed

---

[4] The Amendment 2 option does, however, have an "effective close date" of about October 11, 2023. At first glance, it appears the Amendment 2 option remains in force until the termination of the contract. Practically speaking, however, the ability of a third-party transferee to exercise the option with any effect ends 180 days prior to the two-year term starting on April 11, 2024. At that point, the unaltered terms of Section 11.1 allow termination no earlier than April 11, 2026. Exercising the option during that period would have no impact on the term or function of the contract.

[5] Defendant's proposed interpretation operates as a "race" in that whichever party sends notice first (either to extend or terminate) "wins" in the sense that its action is effective to impact the term of the contract.

7

under the contract during the "last five (5) years of the term" in the event of "damage or destruction" of the leased property. *Id.* Restaura's notice meant that the contract was no longer in its last five years. *Id.* Thus, the court found that St. Louis Concession could not exercise its termination right. *Id.*

The *Restaura* contract is, however, unlike the License Agreement in this case. There, the contract provided two rights, both of which had immediate effect when exercised. Here, exercise of the Amendment 2 option immediately augments the terms of the contract while Section 11.1 notice does not. Section 11.1 notice simply lets the other party know that the contract is set to end, by the contract's terms, at a future date. By its plain language, Section 11.1 notice has no impact on the ongoing obligations and contractual rights of the contracting parties. It does not expressly state, or imply, that it operates to cancel or nullify other aspects of the agreement. As Section 11.1 does not expressly, or implicitly, state that notice of intent to terminate has an immediate impact on the contractual relationship, it is not reasonable to read that provision as instituting a "race to notice" regime.

Fourth, Plaintiff's understanding of Amendment 2 as exercisable post-notice of termination does not render Section 11.1 of the License Agreement a nullity for Defendant.[6] "A contract must be interpreted in a way that gives all of its provisions meaning." *Current Tech. Concepts, Inc.*, 530 N.W.2d at 543. The court must "construe a contract as a whole and attempt to harmonize all of its clauses." *Storms, Inc. v. Mathy Const. Co.*, 883 N.W.2d 772, 776 (Minn. 2016). Prior to Amendment 2, the licensee and licensor had parallel unilateral rights to terminate

---

[6] Defendant's proposed interpretation also gives meaning to each provision of the License Agreement. Defendant's interpretation is not, however, consistent with the plain and ordinary meaning of the contract. Thus, whether it gives meaning to all provisions is irrelevant to the interpretation of the agreement.

8

at a later date given compliance with Section 11.1's notice requirement. The Amendment 2 option, while unexercised, leaves Section 11.1 "as is." (D.I. 3, Compl. Exh. A at Amend. 2, ¶ 2). That is, both Parties have the right to give notice of termination. The practical implication of Amendment 2 is that the licensor's delivery of notice of its intent to terminate, rather than necessarily resulting in an actual termination, puts the licensee on the clock as having to choose whether to exercise its Amendment 2 option. If the licensee does nothing, the licensor's notice is effective, and the license terminates according to the terms of Section 11.1. If the licensee exercises its option, then, rather than terminating at the end of the next two-year period, the licensor's notice is effective to terminate the contract no earlier than April 11, 2026. Thus, Plaintiff's understanding of the License Agreement gives every term meaning.

Considering the interaction of Amendment 2 and Section 11.1, I find that SpePharm had the right to exercise its Amendment 2 option after Eisai gave notice of its intent to terminate the contract. It is undisputed that SpePharm sent written notice to Eisai stating that it was exercising its right to extend the License Agreement prior to April 10, 2020, when the License Agreement was set to expire. Thus, I find that SpePharm's notice was effective to extend the agreement to April 11, 2026.

## IV. CONCLUSION

As the plain language of the contract is unambiguous that the option remained available to SpePharm after Eisai sent notice of its intent to terminate, I will grant Plaintiff's Motion for Judgment on the Pleadings and deny Defendant's cross-motion. The contract's current term runs until April 11, 2026.

As I find that SpePharm's exercise of its option was effective, I do not address its argument that Eisai's notice of termination was ineffective. I also do not address its motion to

strike portions of Eisai's reply brief. Any improper new arguments in Defendant's reply did not impact the outcome. Thus, the motion to strike is moot.